UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ANTONE SILVA,<br>     *Plaintiff,*<br>v.<br><br>STATE OF RHODE ISLAND, TOWN<br>OF TIVERTON, PATRICK W. JONES,<br>Individually and as Chief of Police for the<br>Tiverton Police Department, SERGEANT<br>MICHAEL BARBOZA, JOSHUA<br>PELLETIER and RYAN HUBER,<br>     *Defendants.* | C.A. No. 1:19-cv-00429-MSM-LDA |

## TIVERTON DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### I.   INTRODUCTION

Plaintiff Antone Silva ("Plaintiff") has filed a Second Amended Complaint alleging multiple claims against several Defendants, including the Town of Tiverton ("Town") and several Tiverton police officers, namely Chief of Police Patrick W. Jones ("Jones"), Detective Sergeant Michael Barboza ("Barboza"), Sergeant Joshua Pelletier ("Pelletier"), and Patrol Officer Ryan Huber ("Huber") (collectively the "Tiverton Defendants").   The Second Amended Complaint includes twenty (20) counts against the Tiverton Defendants,[1] all of which arise from a series of three arrests of Plaintiff between April 2018 and December 2018.   Specifically, Plaintiff claims that the latter two of these arrests were unlawful because they were based on a dismissed no contact order that nevertheless continued to appear in Rhode Island's restraining order no-contact order

---

[1] Plaintiff brings constitutional claims under the Fourth and Fourteenth Amendments of the United States Constitution and Article I, § 6 of the Rhode Island Constitution, along with state-law claims for intentional infliction of emotional distress and violations of his privacy rights under R.I. Gen. Laws § 9-1-28.1(a)(1), against Barboza (Counts I-V), Pelletier (Counts VI-X), and Huber (Counts XI-XV).   He also brings a claim for supervisory liability under 42 U.S.C. § 1983 against the Town and Jones (Count XVI) and state-law negligence claims against each of the Tiverton Defendants (the second Counts XV and XVI and Counts XVII-XVIII).

("RONCO") system.  The Tiverton Defendants, however, maintain that since these two arrests were conducted after further verifying that the no contact order visible in the RONCO system was active, summary judgment should be granted on all counts against them in the Second Amended Complaint.

## II.   FACTS

### A.   *Plaintiff's arrest on April 14, 2018*

On April 14, 2018 at approximately 7:47 P.M., Plaintiff was arrested by the Tiverton Police Department for domestic simple assault and battery against his girlfriend, Darcie Silvia ("Silvia"). Exhibit A, Tiverton Police Department Arrest Report for Arrest No. 18-135-AR, at 2.  The same day, a no contact order against Plaintiff, with Silvia as the protected party, was drafted.  Exhibit B, No Contact Order dated April 14, 2018.  The information pertaining to this no contact order was entered by a clerk at the Second Division District Court ("District Court") into the Rhode Island Judiciary's Odyssey system on or about April 18, 2018.  Exhibit C, Defendant, State of Rhode Island's Answers to Plaintiff, Antone Silva's Interrogatories, at Response No. 6.  An employee of the Rhode Island Department of Attorney General ("Attorney General") then accepted this information into the State's Bureau of Criminal Investigation ("BCI") system the same day.  Id. at Response No. 7.

The Town later dismissed the no contact order on June 21, 2018.  Exhibit D, Dismissal Under Criminal Rule 48(a) dated June 21, 2018.  The same day, a District Court clerk entered this dismissal into the District Court's Odyssey computer system, on a screen entitled "Case Events." Exhibit E, June 17, 2020 Deposition Transcript of Maureen Palazzo, at 15:24-16:10.  However, the District Court clerk did not enter the information into the matter's "Protective Order" tab, another section contained within the Odyssey system where the termination of a no contact order

is documented.  Id. at 16:17-17:4, 19:3-18.  After June 21, 2018, therefore, the "Case Events" section indicated that Plaintiff's no contact order was dismissed, but the "Protective Order" tab did not.  Id. at 20:3-6.  The State's RONCO system only receives information contained in the "Protective Order" tab, not the "Case Events" screen.  Id. at 20:7-15.

      B.    *Plaintiff's arrest on September 8, 2018*

On September 8, 2018 at approximately 10:26 P.M., while working a security detail at Twin River Casino in Tiverton, Pelletier overheard a request for assistance with a possible domestic issue near one of the casino's restaurants.  Exhibit F, Defendant Town of Tiverton's Response to Plaintiff's First Set of Interrogatories, at Response No. 15.  Upon reaching the area, Pelletier saw Plaintiff and Silvia, both of whom appeared to be intoxicated, speaking with casino security.  Id.  Silvia informed Pelletier that Plaintiff had been acting rude to the restaurant staff, prompting her to decide to leave, and that Plaintiff had followed her out of the restaurant.  Id.  Pelletier then called dispatch and requested a warrant check and an order check for both parties.  Id.; Exhibit G, June 3, 2020 Deposition Transcript of Joshua Pelletier, at 14:6-9.  Dispatch performed the checks, which produced a RONCO record displaying a no contact order with a date issued of April 16, 2018, an expiration date of January 1, 2999, and Silvia as the protected party.  Exhibit H, Tiverton Police Department Specific Query Reports dated September 8, 2018.[2]  Dispatch also contacted RONCO at this time, and RONCO confirmed that the no contact order was active.  Exhibit I, Tiverton Police Department Call Log for Call Number 18-17130.  Dispatch then advised Pelletier of the active no contact order, confirmed through RONCO.  Exhibit F at Response No. 15.  Pelletier testified that this process was "usually what [the police department's]

---

[2] The protected party in the Specific Query Reports is listed as "Darcie Lapointe" rather than "Darcie Silvia."  Exhibit H.  The Tiverton Defendants submit, however, that this report references the same individual identified as "Darcie Silvia" throughout this Memorandum.  See Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment, Docket at #30-1, at 2 (referring to "Darcie Silvia a/k/a Darcie Lapointe").

protocol is." Exhibit G at 14:6.  Pelletier escorted Plaintiff to the front of the casino, advised him that he was in violation of an active no contact order, and placed him under arrest.  Exhibit F at Response No. 15.  Patrolman Marco Valzovano transported Plaintiff to the police station, where Plaintiff was booked, fingerprinted, photographed, and placed in a holding cell.  Id.

On September 10, 2018, Plaintiff appeared in the District Court for his arraignment.  See Exhibit J, June 2, 2020 Deposition Transcript of Michael Barboza, at 12:16-19.  As Barboza, the Tiverton Police Department's prosecution officer, prepared the necessary paperwork for submission, he had an "inkling," based on previous interactions with the Town Solicitor, that the no contact order that Plaintiff purportedly violated had previously been dismissed.  Id. at 13:4-5, 13:23-14:6.  Based on this suspicion, Barboza checked with the clerk's office and confirmed that the no contact order was, in fact, no longer active.  Id. at 13:5-11.  He then moved to dismiss Plaintiff's case.  Id. at 13:11-12.  The District Court terminated the no contact order in its Odyssey system the same day.  Exhibit C at Response No. 6.  The Attorney General accepted the termination into the State's BCI system on September 11, 2018.  Id.

The same day that it terminated the April 2018 no contact order, the District Court also entered, and then terminated, a second no contact order against Plaintiff, with Silvia as the protected party.  Id. at Response No. 8; see also Exhibit K, No Contact Order Dated September 9, 2018.  Although the Attorney General accepted the creation of this second no contact order into the State's BCI system the same day it was created (September 10, 2018), it did not accept the termination of that no contact order until December 31, 2018.  Exhibit C at Response No. 9.  Although the BCI system typically updates automatically to reflect changes entered into the District Court's Odyssey system, occasionally this automatic translation does not occur and "those

two systems may not reflect the same information."  Exhibit L, June 17, 2020 Deposition Transcript of Edward Troiano, at 14:4-12, 15:19-21.

       C.    *Plaintiff's December 19, 2018 arrest warrant*

On December 8, 2018 at approximately 9:24 P.M., Huber was dispatched to Plaintiff's home in response to a reported breaking and entering.  Exhibit F at Response No. 15.  Plaintiff had reported to dispatch that Silvia had broken the back door of his house and fled toward Fall River in a black Honda Civic.  Id.  The dispatcher also advised Huber that there was an active no contact order between Plaintiff and Silvia, with Silvia as the protected party.  Id.  Upon reaching the house, Huber spoke with Plaintiff, who told him that Silvia came to the house while he was cooking dinner at about 9:00 P.M. that night, saw him in the kitchen, and attempted to enter through the kitchen door.  Id.  He stated further that Silvia broke the door frame in the process and immediately left the scene.  Id.  Huber and Patrolman Adam Brillon, who also responded to the scene, found the kitchen to be in disarray, and the door frame had been broken off and was scattered on the kitchen floor.  Id.  Both officers, however, believed that the scene had been staged, as the damage to the door did not appear to them to be recent.  Id.  At Huber's request, Plaintiff showed him footage from a surveillance camera mounted outside the damaged doorway.  Id.  The footage showed Silvia leaving the house at about 9:00 P.M., calmly and seemingly without incident.  Id.  Plaintiff appeared highly intoxicated to Huber during this encounter, to the point that Huber was unable to take a statement from him.  Id.  Huber told him that he would contact him the next day to take his statement.  Id.

Plaintiff contacted the station later that night and gave Huber an address for Silvia in Fall River.  Id.  The Fall River Police Department contacted Silvia and told her to contact the Tiverton Police Department, and Huber also attempted to contact her himself.  Id.  Silvia called Huber at

about 11:00 P.M. and told him that she had first arrived at Plaintiff's home at about 6:00 P.M. that evening.  Id.  She had bought steaks earlier that day and brought them to the house to cook.  Id.  She told Huber that she and Plaintiff were drinking, and that Plaintiff eventually became very intoxicated and confrontational, prompting Silvia to leave at about 9:00 P.M. before the situation escalated.  Id.  Huber asked her about the damaged door frame, and Silvia told him that Plaintiff had broken it while intoxicated several weeks, possibly even months, prior.  Id.

On December 9, 2018, Huber returned to Plaintiff's house to take his statement, and again found Plaintiff to be highly intoxicated.  Id.  Plaintiff showed Huber more footage from the surveillance camera, which showed Silvia arriving at the house at about 6:00 P.M.  Id.  Plaintiff explained that the two of them were drinking and cooking together while trying to work out their past issues.  Id.  They eventually began arguing; Plaintiff then told Silvia to leave, and she did.  Id.  When Huber asked him about the damage to the door frame, Plaintiff initially said that he did not want to get anybody in trouble and did not answer further.  Id.  When Huber pressed him, he paused and avoided eye contact for a long time before eventually saying that Silvia broke it.  Id.  Plaintiff then provided a written statement, which read, "Darcie knocked my door down after told her too leave."  Id.; see also Exhibit M, Tiverton Police Department Statement Form dated December 9, 2018.

Silvia called Huber at the station on December 10, 2018 to tell him that, on the advice of her attorney, she would not come to the station to provide a statement.  Exhibit F at Response No. 15.  She did, however, recount the events to Huber over the phone, and Huber found that her statements that day were consistent with the version of events she had provided two days prior.  Id.

The same day, Huber informed Sergeant James Rossi ("Rossi") of his findings, and Rossi advised him to draft an arrest warrant for Plaintiff for violation of a no contact order.  Id.  Dispatch ran warrant and order checks, which returned a RONCO record that indicated the existence of a no contact order against Plaintiff with a date issued of September 10, 2018, an expiration date of January 1, 2999, and Silvia as the protected party.  Exhibit N, Tiverton Police Department Specific Query Reports dated December 10, 2018.  Once the warrant was drafted, it was then left for Barboza, who was responsible for reviewing it and determining whether it articulated probable cause for an arrest.  Exhibit J at 28:16-20, 66:7-9, 13, 19-21.  In reviewing it, Barboza saw that the responding officers had "followed all the steps.  They called RONCO.  RONCO confirmed . . . the protection order [was] active."  Id. at 66:10-12.  He did not speak with any other officers in the course of reviewing or presenting the warrant, nor did his duties or responsibilities require him to do so.  Id. at 28:21-29:4, 66:7-16, 66:23-67:2.  He did not know that the no contact order articulated in the warrant was connected to Plaintiff's September arrest and court appearance.  Id. at 27:7-11.  Satisfied that the warrant articulated probable cause, Barboza then presented the warrant in the District Court on December 19, 2018, where it was signed by a District Court judge.  Id. at 28:17-20, 66:12-14; Exhibit O, Signed Affidavit and Arrest Warrant for Antone J. Silva dated December 19, 2018.

D.     *Plaintiff's arrest on December 28, 2018*

On December 28, 2018 at approximately 11:24 P.M., Pelletier once again saw Plaintiff at Twin River Casino while working a security detail.  Exhibit F at Response No. 15.  Recognizing him from previous encounters, Pelletier asked dispatch to run Plaintiff's name to check for any outstanding warrants or protective orders.  Id.  Dispatch confirmed that there was an active warrant for Plaintiff's arrest for violation of a no contact order.  Id.; see also Exhibit P, Tiverton Police

Department Specific Query Reports dated December 28, 2018.  Dispatch's checks also revealed the same RONCO record as the checks run on December 10, 2018 in the course of drafting the arrest warrant.  See Exhibit P.  Pelletier testified that he did not know that the no contact order for which the arrest warrant had been issued was related to Plaintiff's September arrest, or even that it arose from a matter involving the Tiverton Police Department.  Exhibit G at 32:4-11, 34:19-22, 35:13-21.

Pelletier then requested backup and approached Plaintiff, advising him that he would be escorted to the casino's lobby because there was an active warrant for his arrest.  Exhibit F at Response No. 15.  When Plaintiff, who appeared to be intoxicated, responded that no such warrant existed and that the Tiverton Police Department simply enjoyed arresting him in the casino, Pelletier reiterated to him that there was an active warrant for his arrest and proceeded to escort him to the lobby.  Id.  Pelletier handcuffed Plaintiff, and another officer then transported Plaintiff to the police station.  Id.

Plaintiff appeared in the District Court on December 31, 2018, at which time the case against him was dismissed because the no contact order that he had purportedly violated was not in effect at the time of his arrest.  See Exhibit Q, District Court Criminal Complaint for Case No. 18-2543; see also Exhibit R, Dismissal Under Criminal Rule 48(a) dated December 31, 2018.  The Attorney General accepted the termination of the no contact order into the State's BCI system the same day.  Exhibit C at Response No. 8.

E.    *The Tiverton Police Department's internal investigation and rules and regulations*

In January 2019, Jones received a letter from Plaintiff's counsel regarding Plaintiff's arrests in September 2018 and December 2018.  Exhibit S, Letter from Brian R. Cunha to Patrick W. Jones dated January 7, 2019.  Upon receiving this letter, Jones assigned Lieutenant James Costa

("Costa") to conduct an internal investigation into the two arrests.  Exhibit T, June 2, 2020 Deposition Transcript of Patrick W. Jones, at 27:14-28:8.  Upon completing his investigation, Costa determined that the allegations of wrongdoing arising from the two arrests were unfounded. Exhibit U, Final Report for Tiverton Police Department Internal Investigation Number 19-1-IV. Jones reviewed the investigation and agreed with Costa's findings.  Id.; Exhibit T at 36:9-17 ("The internal investigation was conducted to assure that the Tiverton police personal [sic] acted within policy and procedure, which they did by contacting RONCO.  I have no doubt that . . . the information they received was that the order was active at that time.").

The Tiverton Police Department's rules and regulations contain a section dedicated to calls involving domestic violence.  See generally Exhibit V, Tiverton Police Department General Order No. 310.10.  Subsection (IV)(C)(5)(b) of that policy provides:

> As soon as practicable, determine if a protective order or no-contact order is in effect.  If such as order is alleged to be in effect, ask to see a copy of it.
>
> 1) If no copy is available, you may contact headquarters to determine if a protective order is in effect and if a copy was served on the defendant.
>
> 2) You may also rely on the statement of the protected person that such an order is in effect.
>
> 3) If no other information is available ask the abusive party if s/he is aware the order is in effect and that s/he is violating it . . . .
>
> 4) A temporary reconciliation of the couple, where the person being protected by the order allows the abuser to enter the residence, does not void the protective order.

Id. at 8.  Subsection (IV)(A)(4) of the same policy provides, in part:

> b. AN ARREST IS MANDATED if you have probable cause to believe . . . violation of a no-contact order issued by a court or bail commissioner, ha[s] occurred within twenty-four (24) hours of the alleged crime (RI General Law 12-29-3).
> . . .

> d. If an arrest without a warrant cannot be made, the officer shall seek a warrant for arrest if there is probable cause to do so.

Id. at 4.

## III.   ARGUMENT

### A.   *Standard of Review*

Under the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is axiomatic that this Court must view the evidence in the light most favorable to the nonmoving party. Morrissey v. Boston Five Cents Sav. Bank, F.S.B., 54 F.3d 27, 31 (1st Cir. 1995). However, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleadings, but . . . must set forth the specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The primary purpose of summary judgment is to permit the court "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required" on the claims being examined. Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 793-94 (1st Cir. 1992). The mandates of Rule 56(c) require entry of summary judgment "upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Thus, "[t]he moving party bears the initial burden of demonstrating a lack of a material issue of fact, which shifts the burden to the non-moving party, who then must show the trier of fact could rule in his favor with respect to each issue." Ferro v. R.I. DOT, 2 F. Supp. 3d 150, 156 (D.R.I. 2014) (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)).

"A fact is 'material' if it potentially could affect the suit's outcome.  An issue concerning such a fact is 'genuine' if a reasonable fact finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Cortes-Iriszarry v. Corporacion Insular DeSeguros, 111 F.3d 184, 187 (1st Cir. 1997) (citations omitted).  As recognized by this Court, "[a] genuine issue of fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Global Epoint, Inc. v. Gtech Corp., 58 F. Supp. 3d 178, 184 (D.R.I. 2014) (quoting Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009)) (internal citation and quotation marks omitted).  But, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Ferro, 2 F. Supp. 3d at 156 (citations omitted).

> B.   *Plaintiff's Fourteenth Amendment claims against Barboza, Pelletier, and Huber should be dismissed, both because they arise from alleged conduct specifically covered by the Fourth Amendment and because the officers' reliance on the record of the no contact order in the RONCO system is not conscience-shocking.*

Plaintiff brings Fourteenth Amendment claims under § 1983 against Barboza, Pelletier, and Huber. See Second Amended Complaint, Docket at #31, at Counts I, VI, XI.  Specifically, he alleges violations of his substantive due process rights. Id.  These claims, however, arise from the same conduct from which Plaintiff's Fourth Amendment claims arise—namely, his two arrests in September and December of 2018 for violations of no contact orders that, as it turned out, were not actually in effect.  Plaintiff's factual allegations assert unreasonable seizures of Plaintiff's person, conduct against which the Fourth Amendment specifically guards.  "Substantive due process is an inappropriate avenue of relief when the governmental conduct at issue is covered by a specific constitutional provision." Pagan v. Calderon, 448 F.3d 16, 33 (1st Cir. 2006); see also

11

S. Cty. Sand & Gravel Co. v. Town of S. Kingstown, 160 F.3d 834, 835 (1st Cir. 1998) ("When a specific provision of the Constitution protects individuals against a particular kind of physical intrusion by government actors, individuals seeking redress for such an intrusion must assert their claims under that particular constitutional rubric instead of invoking the more generalized notion of substantive due process.").[3]   The Second Amended Complaint even includes counts under the Fourth Amendment against each of the three officers subject to his Fourteenth Amendment claims. See Second Amended Complaint, Docket at #31, at Counts II, VII, XII.   Since the Fourth Amendment "suppl[ies] the proper decisional framework" for Plaintiff's allegations, this Court should proceed solely under that amendment and eschew his Fourteenth Amendment claims.   S. Cty. Sand & Gravel Co., 160 F.3d at 835.

Notwithstanding the notion that the Fourteenth Amendment should not apply to Plaintiff's allegations, the record fails to establish the level of conduct necessary to substantiate a substantive due process claim.   The Due Process Clause does not "'guarantee due care' by government officials."   DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005) (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).   Nor does it "impose liability every time someone with state authority causes harm; otherwise, the Constitution would be downgraded to a font of tort law." McConkie v. Nichols, 446 F.3d 258, 260 (1st Cir. 2006) (internal quotation marks omitted) (quoting DePoutot, 424 F.3d at 118).   In a case such as this one, which involves executive branch action, the primary Fourteenth Amendment inquiry is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary

---

[3] Importantly, "the application of this prophylactic rule depends only on whether a specific constitutional provision addresses the type of conduct at issue." Pagan, 448 F.3d at 34.   It does not constitute "a prediction that the complaining party will be successful in pursuing a claim under the applicable provision, nor does it depend on a conclusion that the party has a valid claim thereunder."   Id.

conscience." <u>Gonzalez-Fuentes v. Molina</u>, 607 F.3d 864, 880 (1st Cir. 2010) (quoting <u>Lewis</u>, 523 U.S. at 847 n.8).

"The burden to show state conduct that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond [m]ere violations of state law, even violations resulting from bad faith to something more egregious and more extreme." <u>Meléndez-García v. Sánchez</u>, 629 F.3d 25, 37 (1st Cir. 2010) (quoting <u>J.R. v. Gloria</u>, 593 F.3d 73, 80 (1st Cir. 2010)). "[T]he requisite arbitrariness and caprice for a conscience-shocking executive action" must evidence "more than humdrum legal error." <u>DePoutot</u>, 424 F.3d at 119 (internal quotation marks omitted) (quoting <u>Amsden v. Moran</u>, 904 F.2d 748, 754 n.5 (1st Cir. 1990)). "Executive acts that shock the conscience must be 'truly outrageous, uncivilized, and intolerable.'" <u>Harron v. Town of Franklin</u>, 660 F.3d 531, 536 (1st Cir. 2011) (quoting <u>Hasenfus v. LaJeunesse</u>, 175 F.3d 68, 72 (1st Cir. 1999)). As such,

> [a] hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.

<u>Harron</u>, 660 F.3d at 536 (alterations in original) (quoting <u>Gonzalez-Fuentes</u>, 607 F.3d at 881).

The actions of Barboza, Pelletier, and Huber fall well short of this demanding standard. Given that they became aware of the no contact orders in the normal course of responding to calls for service and likewise knew that those orders were confirmed as active through the Tiverton Police Department's standard protocol, their conduct cannot even be classified as careless or unwise, let alone outrageous, uncivilized, intolerable, or malicious. Plaintiff's arrests were effected based on information received from, and confirmed by, a State-maintained system, which created a situation mandating an arrest under both the police department's policies and procedures

and state law.  The record contains no evidence of individualized animus against Plaintiff on the part of any of the named officers, or any member of the Tiverton Police Department, that manifested itself in this course of events.  Exhibit J at 57:21-58:2 ("Honestly, he doesn't come up in conversation.  I really don't know who he is. . . . So I don't really know his reputation.  I really don't know who he is.  I couldn't tell you."); Exhibit G at 29:16-19 ("You're making it like we're the ones who are purposely out targeting Mr. Silva.  But like I said, we received a call.  So we have to go to calls that we receive.").

In short, neither of Plaintiff's arrests at issue in the instant matter were arbitrary, uncivilized, or otherwise egregious so as to "shock the contemporary conscience."  Gonzalez-Fuentes, 607 F.3d at 880 (quoting Lewis, 523 U.S. at 847 n.8).  Rather, Barboza, Pelletier, and Huber acted as legally required given the situations they encountered.  Plaintiff, therefore, has not presented a viable substantive due process claim against any of these Defendants.

C.     *Plaintiff's Fourth Amendment claims against Barboza, Pelletier, and Huber fail because there was probable cause to substantiate both arrests.*

Plaintiff brings claims of unreasonable search and seizure under the Fourth Amendment against Barboza, Pelletier, and Huber, each arising out of their respective involvements in his two arrests.  See Second Amended Complaint, Docket at #31, at Counts II, VII, XII.[4]  "[T]he ultimate question for determining whether an arrest violates the Fourth Amendment is . . . whether there was probable cause to believe that the arrestee had committed or was committing a crime."  Wilson

---

[4] Plaintiff brings corresponding claims against each of the officers under Article I, § 6 of the Rhode Island Constitution. See Second Amended Complaint, Docket at #31, at Counts III, VIII, XIII.  The Rhode Island Supreme Court has repeatedly held that "article 1, § 6 has the same effect as the fourth amendment of the Federal Constitution."  State v. Berker, 391 A.2d 107, 111 (R.I. 1978) (citing State v. Davis, 251 A.2d 394 (R.I. 1969)); see also State v. Foster, 842 A.2d 1047, 1050 n.3 (R.I. 2004) (noting that the Fourth Amendment is "substantively the same as Article 1, Section 6 of the Rhode Island Constitution").  The District of Rhode Island has also held that, generally, "Art. 1, § 6 of the Rhode Island Constitution is co-extensive with the Fourth Amendment of the United States Constitution."  Barboza, Pelletier, and Huber submit, therefore, that they are entitled to summary judgment with respect to Plaintiff's claims under the Rhode Island Constitution for the same reasons they are entitled to summary judgment with respect to the Fourth Amendment claims.

v. City of Boston, 421 F.3d 45, 55 (1st Cir. 2005).  Probable cause exists when, "at the time of the arrest, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'"  Holder v. Town of Sandown, 585 F.3d 500, 504 (1st Cir. 2009) (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)); see also Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 9 (1st Cir. 2004) ("Probable cause for an arrest exists when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators.").  This is an objective test that "turns on what a reasonable police officer would conclude based on the evidence actually available at the time (and not on unknown facts or subsequent events)."  Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003) (citing Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 254 (1st Cir. 1996)).  It "requires only a *probability* that the defendant committed the crime."  Holder, 585 F.3d at 504 (emphasis added) (internal citations omitted).

"The only relevant facts are those known to the officer."  Id.  During the September incident, Pelletier responded to a report of a disturbance in Twin River Casino involving Plaintiff and Silvia, saw the two of them together upon responding, and learned from Silvia that they had been dining together prior to the disturbance.  Exhibit F at Response No. 15.  He then, through dispatch, ran license, warrant, and order checks for both Plaintiff and Silvia, which is the Tiverton Police Department's standard procedure when responding to an incident.  Id.; Exhibit G at 14:6-9.  Dispatch then informed him of an active no contact order against Plaintiff, with Silvia as the protected party, that had been personally confirmed through RONCO, also pursuant to the police department's standard procedure.  Exhibit G at 14:6-9.  No other details of the no contact order

were available to Pelletier at that time; he did not know that Plaintiff was arrested by the Tiverton Police Department five months prior, and he did not know that the no contact order that arose from that arrest was dismissed three months prior. Based on this information, coupled with Pelletier's own observations that Plaintiff and Silvia were together at the time he responded, a reasonable officer would have concluded that Plaintiff was in violation of an active no contact order. See Valente, 332 F.3d at 32 (citing Roche, 81 F.3d at 254). In short, there existed a probability that Plaintiff was committing a crime, and Pelletier arrested him accordingly. See Holder, 585 F.3d at 504 (internal citations omitted).

Just as it does for an arrest, "[t]he Fourth Amendment requires that a warrant must be supported by probable cause." Wilson, 421 F.3d at 55 (internal citations omitted); see also Hoffman v. Reali, 973 F.2d 980, 985 (1st Cir. 1992) (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)) ("An arrest warrant complies with the Fourth Amendment if, under the totality of circumstances, there is probable cause to believe the suspect committed the offense."). When Huber drafted the arrest warrant on December 10, 2018, the facts and circumstances of which he was aware mirrored those available to Pelletier when he arrested Plaintiff on September 8, 2018— Plaintiff and Silvia had spent time together two days prior, and there was a record of an active no contact order between the two parties at that time. Huber included this information in the warrant application, which Barboza then reviewed and presented in court on December 19. To the extent that Barboza even recognized Plaintiff's name as he reviewed it and remembered the course of events that occurred in the District Court on September 10, he could not have known from the information at hand that the no contact order Plaintiff had purportedly violated on December 8 was listed as active erroneously. Barboza knew only that a purportedly active no contact order between Plaintiff and Silvia was in effect; he did not know, nor did he have reason to know, the date that

16

purported no contact order was created, the particular police department involved, or any other information as to how the no contact order took effect.  See Exhibit J at 27:7-11 ("I knew that one got dismissed on September 10, but it doesn't mean that he hadn't got arrested between September 10 and December any time or some type of order was taken out.  I don't know that.").  Furthermore, when Pelletier arrested Plaintiff pursuant to the warrant, he knew only that the warrant was for a violation of a no contact order.  He did not know that the no contact order giving rise to that warrant was the same one that the District Court had both created and dismissed on September 10, 2018. Exhibit G at 32:4-11.  In fact, he was not even aware that the no contact order was from a Tiverton matter.  Id. at 34:19-22, 35:13-21.

The facts available to Barboza, Pelletier, and Huber at the time of their respective actions in this matter gave them probable cause with respect to both of Plaintiff's arrests.  Therefore, summary judgment should enter with respect to Plaintiff's Fourth Amendment claims.

D.    *Barboza, Pelletier, and Huber are entitled to qualified immunity with respect to Plaintiff's constitutional claims because there was probable cause to substantiate both arrests and because their conduct was not conscience-shocking.*

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  McDonald v. City of Boston, 334 F. Supp. 3d 429, 438-39 (D. Mass. 2018).  "The ultimate question of qualified immunity should ordinarily be decided by the court."  St. Hilaire v. City of Laconia, 71 F.3d 20, 24 (1st Cir. 1995). While factual issues may be sent to the jury, where, as here, material facts are not in dispute, "[t]he ultimate question of whether a reasonable police officer, on the basis of information known to him, could have believed his actions were in accord with constitutional rights is a question of law,

subject to resolution by the judge, not the jury." Id. at 24 n.1 (internal quotations and citation omitted).

To determine whether a defendant is entitled to qualified immunity, a court inquires "(1) whether the facts alleged or shown by a plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263 (1st Cir. 2009). The second step involves two prongs: (1) the clarity of the law at the time of the alleged violation, and (2) whether, on the facts of the case, a reasonable defendant would have understood that his conduct violated a plaintiff's constitutional rights. Id.

The Court applies a good faith test that allows questions of qualified immunity to be decided as a matter of law in appropriate cases. Malachowski v. City of Keene, 787 F.2d 704, 714 (1st Cir. 1986). This test requires viewing the official's actions from an objectively reasonable standpoint. Id. The decisive question becomes whether another police officer, standing in the shoes of these Defendants, would have concluded that their actions violated a clearly established statutory or constitutional right. Ricci v. Urso, 974 F.2d 5, 7 (1st Cir. 1992). A "reasonable, although mistaken, conclusion about the lawfulness of one's conduct does not subject a government official to personal liability." Cookish v. Powell, 945 F.2d 441, 443 (1st Cir. 1991).

The First Circuit has observed that the "qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992) (internal quotation marks and citation omitted). When addressing claims for qualified immunity on summary judgment, the Court must grant summary judgment if the plaintiff fails to generate a trialworthy issue by

undermining the evidence supporting the defendant's objectively reasonable belief that his actions were lawful.  Dean v. City of Worcester, 924 F.2d 364, 367 (1st Cir. 1991).

At the outset, the Tiverton Defendants submit that Plaintiff has failed to establish any violation of his Fourth Amendment rights by Barboza, Pelletier, or Huber.  As discussed above, the officers had probable cause in arresting Plaintiff for violation of a no contact order on September 8, 2018 and in drafting and presenting a warrant for his arrest for the same offense on December 10, and 19, 2018, respectively.  Nevertheless, neither arrest violated "clearly established statutory or constitutional rights of which a *reasonable person would have known*."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (emphasis added).  The fact that a police officer needs probable cause to effectuate an arrest was well-established at the time of Plaintiff's September 2018 arrest, as was the fact that an officer needs probable cause to apply for an arrest warrant at the time the warrant for Plaintiff's arrest was drafted and presented.  With respect to the September arrest, which was not conducted pursuant to a warrant, the individual Tiverton Defendants are entitled to qualified immunity "so long as the presence of probable cause is at least arguable."  Glik v. Cunniffe, 655 F.3d 78, 88 (1st Cir. 2011) (quoting Ricci, 974 F.2d at 7).  "[I]n the case of a warrantless arrest, if the presence of probable cause is arguable or subject to legitimate question, qualified immunity will attach."  Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004) (citing Ricci, 974 F.2d at 7).

Based on the information available to Pelletier and dispatch at the time, the presence of probable cause was, at the very least, arguable when Pelletier arrested Plaintiff on September 8, 2018.  The only facts known to Pelletier at the time he arrested Plaintiff in 2018 were that Plaintiff and Silvia were currently in each other's presence and that a no contact order between those two parties, which dispatch confirmed as active through RONCO, was in effect.  There is no evidence

to show that dispatch informed Pelletier of any information about the no contact order other than the fact that it was active, that it was against Plaintiff, and that Silvia was the protected party. Pelletier, knowing only that a standard warrant check had returned an active no contact order against Plaintiff, that RONCO had confirmed this information via telephone, and that the two parties to the order were currently in each other's presence, had "an objectively reasonable basis for believing that probable cause existed" and that Plaintiff was violating an active no contact order. Ricci, 974 F.2d at 7.

With respect to Plaintiff's December arrest, the relevant question is whether Huber and Barboza's conclusion that there was probable cause to seek an arrest warrant was, "at the time, *sufficiently reasonable* to afford [them] the protection of qualified immunity." McDonald, 334 F. Supp. 3d at 439 (emphasis added) (quoting Lewis v. City of Boston, 829 F. Supp. 471, 476 (D. Mass. 1993)).  In other words, the question is whether "[a]nother officer, standing in [their] shoes and possessing the same information, might reasonably have made the same decision." Id.  "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." Id.

As in the case of a warrantless arrest, "[i]t is objectively reasonable for officers to seek an arrest warrant 'so long as the presence of probable cause is at least arguable.'" Burke v. Town of Walpole, 405 F.3d 66, 87 (1st Cir. 2005) (quoting Prokey v. Watkins, 942 F.2d 67, 72 (1st Cir. 1991)).  Qualified immunity even applies if probable cause does not exist to support the arrest, unless the warrant application lacks evidence of probable cause to the extent that belief in its contents would be unreasonable. Abreu-Guzman v. Ford, 241 F.3d 69, 73 (1st Cir. 2001) (quoting St. Hilaire, 71 F.3d at 28).  Furthermore, "[w]here the sufficiency of the facts fall into the grey area appropriate for judicial determination, submission of the affidavit to a magistrate will insulate

the officer from liability." <u>Briggs v. Malley</u>, 748 F.2d 715, 721 (1st Cir. 1984).  "[L]iability does not attach simply because there is a later determination of no probable cause." <u>Id.</u>

At the time Huber drafted the warrant, he was aware only that Plaintiff and Silvia were together for about three hours on December 8, 2018 and that dispatch's checks had yielded an active no contact order between the two parties.  These same facts, and nothing more, were available to Barboza when he reviewed the warrant and presented it in court.  He did not know that the no contact order described in the warrant arose from Plaintiff's April 2018 arrest, had previously been dismissed, and, in reality, was no longer active.  For all Barboza knew, Plaintiff had been arrested by another police department, and had obtained another no contact order as a result, between his court appearance on September 10 and his encounter with Huber on December 8.  Exhibit J at 27:2-19.  Another officer standing in either Huber or Barboza's shoes, armed with the same information they had at the time, would very well have decided, reasonably, that this information constituted probable cause for an arrest warrant.

Furthermore, the warrant application drafted by Huber and presented by Barboza did not lack evidence of probable cause such that "belief in its contents would be unreasonable."  <u>Abreu-Guzman</u>, 241 F.3d at 73.  The affidavit provided in part that dispatch informed the officers who responded to Plaintiff's home on December 8, 2018 of an active no contact order between Plaintiff and Silvia.  It further provided that the officers learned from Plaintiff and confirmed through further investigation that he and Silvia were together for approximately three hours on that date.  Based on these facts, a belief that there was probable cause that Plaintiff had violated an active no contact order was not unreasonable.  Nevertheless, even in the event these facts do fall into the proverbial "gray area," Barboza submitted them to a magistrate, who then signed both the affidavit

21

and the arrest warrant, thereby insulating Barboza and Huber from liability.  See Briggs, 748 F.2d at 721.

Since there was probable cause both to arrest Plaintiff for violation of a no contact order in September 2018 and to seek a warrant for his arrest for the same offense in December 2018, Barboza, Pelletier, and Huber are entitled to qualified immunity with respect to Plaintiff's Fourth Amendment claims.

The Tiverton Defendants are further entitled to qualified immunity for Plaintiff's substantive due process claims under the Fourteenth Amendment.  They first submit, as discussed above, that the actions taken by Barboza, Pelletier, and Huber in this matter were not "so shocking or violative of universal standards of decency" as to constitute a violation of Plaintiff's substantive due process rights.  Freeman v. Town of Hudson, 714 F.3d 29, 40 (1st Cir. 2013) (quoting Amsden, 904 F.2d at 757).  At the very least, however, a reasonable officer in their position would not have known that arresting Plaintiff, knowing that a no contact order against him had appeared in the RONCO system and had subsequently been confirmed as active, amounted to a violation of Plaintiff's constitutional rights.  Consequently, the individual Tiverton Defendants are entitled to qualified immunity with respect to Plaintiff's constitutional claims.

E.   *All of the Tiverton Defendants are entitled to qualified immunity with respect to Plaintiff's state law claims because those claims are grounded in his federal claims.*

Plaintiff's state law claims, including those advanced under Article 1, Section 6 of the Rhode Island Constitution, those alleged under R.I. Gen. Laws § 9-1-28.1, and those set forth under common law, are grounded in his federal § 1983 claims.  As a result, the individual Tiverton police officers are also entitled to qualified immunity with respect to the state law claims, much like the qualified immunity afforded them under § 1983.  Estrada v. Rhode Island, 594 F.3d 56, 63 (1st Cir. 2010) (citing Hatch v. Town of Middletown, 311 F.3d 83, 89-90 (1st Cir. 2002) (officer

entitled to qualified immunity under federal law also entitled to qualified immunity for same claim under Rhode Island law)); see also Ensey v. Culhane, 727 A.2d 687, 690 (R.I. 1999); Pontbriand v. Sundlun, 699 A.2d 856, 867 (R.I. 1997).  "Ensey and Pontbriand reflect Rhode Island's recognition of a qualified immunity defense under state law analogous to the federal doctrine established by the United States Supreme Court in Harlow, 457 U.S. at 818, cited with approval in both Rhode Island decisions, and routinely applied in § 1983 cases."  Hatch, 311 F.3d at 90.

Furthermore, because the individual officers are immune from suit on the state law claims, so too is the Town.  See Morales v. Town of Johnston, 895 A.2d 721, 728-29 (R.I. 2006) (where high school soccer coaches have statutory immunity from suit, school district cannot be held liable based upon same conduct); see also DiQuinzio v. Panciera Lease Co., 612 A.2d 40, 43 (R.I. 1992) (because operator of vehicle immune from suit pursuant to exclusivity provision of Workers' Compensation Act, there could be no cause of action against vehicle owner); Gray v. Derderian, 400 F. Supp. 2d 415, 424 (D.R.I. 2005) (no "liability can be charged to the [municipality], based on the doctrine of respondeat superior, if the [municipality's] agent or employee is immune from prosecution").  Summary judgment, therefore, should enter for the Tiverton Defendants on all of Plaintiff's state law claims.

> F.    *Barboza, Pelletier, and Huber are not liable for intentional infliction of emotional distress, both because their conduct was not extreme and outrageous and because Plaintiff has not shown any physical manifestations allegedly resulting from his distress.*

To bring a valid claim for intentional infliction of emotional distress,

(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be *extreme and outrageous*, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe.

Shannahan v. Moreau, 202 A.3d 217, 230 (R.I. 2019) (emphasis in original) (quoting Gross v. Pare, 185 A.3d 1242, 1245-46 (R.I. 2018)).  With respect to extreme and outrageous conduct, "*[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*"  Swerdlick v. Koch, 721 A.2d 849, 863 (R.I. 1998) (emphasis in original) (internal quotation marks and citation omitted).  Whether certain conduct is sufficiently extreme and outrageous to allow a plaintiff to recover for intentional infliction of emotional distress is a legal question to be decided by the Court.  Jalowy v. Friendly Home, 818 A.2d 698, 707 (R.I. 2003).

The actions of Barboza, Pelletier, and Huber fall well short of extreme and outrageous so as to permit recovery in this matter.  As set forth above, each of these officers—Pelletier in effectuating the two arrests, Huber in drafting the warrant that led to the December arrest, and Barboza in signing that warrant and presenting it in court—acted based on affirmative indications from RONCO, obtained through dispatch according to the Tiverton Police Department's standard practice, that Plaintiff had a presently-active no contact order with Silvia as the protected party.  They did not know that the no contact order that was appearing as active in the system had been dismissed previously; rather, they simply used the information provided and confirmed by RONCO, as is customary, and arrested Plaintiff accordingly.  Generally, a case of extreme and outrageous conduct "is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Swerdlick, 721 A.2d at 863 (internal citation omitted).  This is hardly such a case.  Barboza, Pelletier, and Huber, with probable cause, simply arrested Plaintiff pursuant to their duties as

police officers.  Plaintiff's claim for intentional infliction of emotional distress, therefore, fails for lack of extreme and outrageous conduct.

Furthermore, the record is devoid of any physical symptomatology resulting from the emotional distress that Plaintiff has allegedly suffered.  The Rhode Island Supreme Court "has raised [the] already high bar [to prove an intentional infliction of emotional distress claim] by making physical symptomatology an additional predicate to recovering damages." Norton v. Hoyt, 278 F. Supp. 2d 214, 220 (D.R.I. 2003) (citing Reilly v. United States, 547 A.2d 895, 899 (R.I. 1988)); see also Marchetti v. Parsons, 638 A.2d 1047, 1050 (R.I. 1994) (citing Reilly, 547 A.2d at 897) ("[A]bsent physical manifestations, a court could not be certain of the genuine nature of the injuries because such injuries could be, to a great extent, merely speculative.").  In each of its three counts of intentional infliction of emotional distress, the Second Amended Complaint alleges only that Plaintiff suffered "severe emotional distress" at the hands of Barboza, Pelletier, and Huber, without detailing the nature of that distress any further.  See Second Amended Complaint, Docket at #31, at ¶¶ 38, 39, 53, 54, 68, 69.  Plaintiff's discovery responses likewise fail to illuminate his emotional distress claims; he provided nothing in response to a document request from the Tiverton Defendants specifically seeking medical documentation and, in response to an interrogatory seeking "a complete, itemized statement of all damages," including those for emotional distress, he referenced only a tarnished reputation stemming from publication of his arrest in a local newspaper.  "To defeat a motion for summary judgment," Plaintiff cannot "rely upon 'unsupported conclusory assertions of physical ills contained in [his] complaint.'" Dibattista v. State, 808 A.2d 1081, 1089 (R.I. 2002) (quoting Clift v. Narragansett Television L.P., 688 A.2d 805, 813 (R.I. 1996)).  Based on the record, Plaintiff has failed to allege, let alone substantiate, any physical ills.

Because the officers' conduct in this matter was neither extreme nor outrageous, and because Plaintiff has failed to set forth any physical symptomatology by which his alleged emotional distress has manifested itself, the Court should find that Plaintiff has not alleged valid claims for intentional infliction of emotional distress against Barboza, Pelletier, and Huber.

G.    *Plaintiff cannot sustain his claims against Barboza, Pelletier, and Huber for violation of his privacy rights under R.I. Gen. Laws § 9-1-28.1 because he cannot show any intrusion upon seclusion as contemplated by this statute.*

Plaintiff brings additional state law claims against Barboza, Pelletier, and Huber, alleging that each officer violated R.I. Gen. Laws § 9-1-28.1(a)(1), which provides for a "right to be secure from unreasonable intrusion upon one's physical solitude or seclusion." To establish a violation of this right, a plaintiff must show "an invasion of something that is entitled to be private or would be expected to be private." Id. at § 9-1-28.1(a)(1)(i)(A). The Tiverton Defendants fail to comprehend how any such invasion has occurred in this matter. "[A] defendant is subject to liability [for intrusion upon seclusion] only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." Swerdlick, 721 A.2d at 857 n.11 (quoting Restatement (Second) of Torts § 652B cmt. c (Am. Law Inst. 1977)). None of the Tiverton Defendants engaged in any such conduct in the instant matter. "[T]here is no liability for the examination of a public record concerning the plaintiff," which is all that the Tiverton Defendants did in performing checks while responding to calls for service involving Plaintiff. Swerdlick, 721 A.2d at 857 n.11 (quoting Restatement (Second) of Torts § 652B cmt. c (Am. Law Inst. 1977)).

Furthermore, both arrests occurred at Twin River Casino in Tiverton, a public establishment; the section of the privacy statute under which Plaintiff has brought suit "only protects against an invasion of 'one's physical solitude or seclusion,' neither of which is present

26

when one ventures outside his or her house into public view." Swerdlick, 721 A.2d at 857.  Since

Plaintiff can show no intrusion upon seclusion as contemplated by R.I. Gen. Laws § 9-1-28.1 or

subsequent judicial interpretation thereof, this Court should grant summary judgment in favor of

Barboza, Pelletier, and Huber on his privacy claims.

> H.   *Plaintiff does not have a viable* Monell *claim against the Town or Jones because he has shown neither wrongdoing by any Tiverton Police Department employee nor the existence of any unconstitutional municipal policy or custom.*

Plaintiff alleges that both the Town and Jones "unconstitutionally failed to properly hire,

train, supervise, and discipline officers in the department."  Second Amended Complaint, Docket

at #31, at ¶ 75.  A municipality may be held liable under § 1983 "when its agents and employees

committed constitutional violations, but not under a theory of respondeat superior."  Young v. City

of Providence, 404 F.3d 4, 24 (1st Cir. 2005); see also Monell v. Dep't of Soc. Servs., 436 U.S.

658, 691-95 (1978).  "[O]nly when the governmental employees' execution of a government's

policy or custom . . . inflicts the injury and is the moving force behind the constitutional

violation . . . can [the municipality] be liable."  Young, 404 F.3d at 24 (internal quotations omitted);

see Monell, 436 U.S. at 694.  "Assessing liability against the [Town] requires two basic elements:

first, that [P]laintiff's harm was caused by a constitutional violation, and second, that the [Town]

be responsible for that violation."  Young, 404 F.3d at 25-26; see also Collins v. City of Harker

Heights, 503 U.S. 115, 120 (1992).

The United States Supreme Court, "concerned that municipal liability based on fault by the

[Town] might collapse into de facto respondeat superior, has set a *very high bar* for assessing

municipal liability under Monell."  Young, 404 F.3d at 26 (emphasis added); see, e.g., Silva v.

Worden, 130 F.3d 26, 31-32 (1st Cir. 1997) (noting that the alleged municipal action at issue must

constitute a policy of custom attributable to the municipality).  The U.S. Supreme Court has

imposed two additional requirements to prove municipal liability: first, "that the municipal policy or custom actually have caused the plaintiff's injury, and [second] that the municipality possessed the requisite level of fault, which is generally labeled in these sorts of cases as 'deliberate indifference.'"   Young, 404 F.3d at 26.   "Causation and deliberate indifference are separate requirements, although they are often intertwined."  Id.

In the first instance, the Town "cannot be derivatively liable for what was not a violation in the first place."  Carapellucci v. Winchester, 707 F. Supp. 611, 618 (D. Mass. 1989) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)).  As noted above, neither Barboza, Pelletier, Huber, nor any other Tiverton Police Department employee violated Plaintiff's constitutional rights in the course of either his September 2018 arrest or his December 2018 arrest.  Rather, they effectuated both arrests equipped with probable cause in the form of confirmations of an active no contact order from RONCO and the knowledge that Plaintiff and Silvia had spent time together when that order was purportedly in effect.  Without the required individual liability, the Town cannot be held responsible and judgment must enter in its favor.

Nevertheless, the record does not reflect an "unconstitutional custom or policy . . . wherein police misconduct was encouraged, acquiesced to or condoned or in which Defendants were deliberately indifferent to such misconduct."  Second Amended Complaint, Docket at #31, at ¶ 76. Jones, Barboza, and Pelletier each testified that, in the course of both of Plaintiff's arrests, the responding officer contacted dispatch to run warrant and order checks, that those checks yielded a record of an active no contact order between Plaintiff and Silvia, that dispatch then called and confirmed through RONCO that the no contact order was active, and that this process constituted the police department's standard operating procedure.  See Exhibit T at 27:7-13, 35:3-6; Exhibit J at 22:24-23:5, 25:2-4; Exhibit G at 14:6-12.  This procedure is consistent with the police

department's written policy with respect to incidents of domestic violence, which instructs responding officers to, "[a]s soon as practicable, determine if a protective order or no-contact order is in effect." Exhibit V at 8. If a copy of the no contact order is not available on the scene, officers "may contact headquarters to determine if a protective order is in effect . . . ." Id. In the instant matter, this step occurred in the form of dispatch's warrant checks and the telephonic confirmation of those checks through RONCO. The policy provides that officers "may also rely on the statement of the protected person that such an order is in effect," but there is no evidence in the record that Silvia informed either Pelletier in September or Huber in December that a no contact order was or was not in effect. Id. Furthermore, although officers may also "ask the abusive party if s/he is aware the order is in effect and that s/he is violating it," they are instructed to do so only "[i]f no other information is available"; the availability of the RONCO information thus eliminated the need for this step in the instant matter. Id.

Most importantly, the same policy provides, in accordance with Rhode Island law, that an arrest is mandatory where an officer has probable cause to believe that a violation of a no contact order has occurred. Id.; see also R.I. Gen. Laws § 12-29-3(b)(v). A warrantless arrest in this situation must be made within twenty-four hours of the purported violation, and if no such arrest can be made, the officer "shall seek a warrant for arrest if there is probable cause to do so." Id. at 8-9; R.I. Gen. Laws § 12-29-3(b)(v)(3)-(4). In the instant matter, all officers involved followed these mandates. Pelletier, supplied with the RONCO record and confirmation of an active no contact order, arrested Plaintiff without a warrant immediately after personally seeing him purportedly violating that order in September 2018; Huber, equipped with the same RONCO information, sought a warrant on December 10, 2018 after confirming over the span of three days that Plaintiff had purportedly committed the same offense on December 8, 2018. The Tiverton

Police Department's own internal investigation reached the same conclusion.  Exhibit T at 36:9-17.

Since Plaintiff can establish neither a violation by any Tiverton Police Department nor any unconstitutional policy or custom maintained by the Town or the police department, summary judgment should enter in favor of the Town and Jones with respect to his claim for supervisory liability.

I.    *Plaintiff's negligence claims against the Tiverton Defendants should be dismissed because they are not separate or distinct from his Fourth Amendment claims.*

Plaintiff's Second Amended Complaint pleads claims of negligence against each of the Tiverton Defendants.  See Second Amended Complaint, Docket at #31, at the second Counts XV-XVI and Counts XVII-XVIII.  These claims are grounded in the same facts as Plaintiff's Fourth Amendment claims, namely his arrests in September and December of 2018.  The negligence claims should, therefore, merge with those Fourth Amendment claims, because a person cannot commit an intentional tort negligently.  See Mucci v. Town of N. Providence, 815 F. Supp. 2d 541, 548 (D.R.I. 2011) (internal citation omitted) (noting that "a plaintiff may not advance claims of excessive force and negligence predicated on identical facts").  Although this Court has only applied this principle with respect to a Fourth Amendment claim for excessive force, courts in other Circuits have applied it more broadly.  See Whitfield v. Tri-Metro. Transp. Dist., Civil No. 06-1655-HA, 2009 U.S. Dist. LEXIS 26469, at *28 (D. Or. Mar. 30, 2009) (internal citation omitted) ("[A]s a matter of principle, the court recognizes that a plaintiff may allege negligence as a basis for recovery separate from § 1983 for acts arising in the Fourth Amendment search and seizure context.  The negligence claim, however, should not be founded on the same facts that give rise to the § 1983 claim."); see also Evans v. City of Etowah, Case No:1:06-cv-252, 2008 U.S. Dist. LEXIS 27275, at *31-32 (E.D. Tenn. Apr. 3, 2008) (in case involving allegations of false

arrest, plaintiff "cannot maintain a negligence action based on the intentional torts of the officers, and does not identify any negligence independent of those actions").

The rationale for merging negligence and excessive force claims based on identical facts applies equally to claims for negligence and unlawful seizure.  In the instant matter, the facts detailed in Plaintiff's Second Amended Complaint amount to allegations of false arrest, an intentional tort.  Plaintiff uses this single set of facts as the basis for both his Fourth Amendment claims and his negligence claims.  His allegations, therefore, "do not reflect negligence, but rather an intentional tort with a conclusory allegation of negligence." Hall v. Lanier, 708 F. Supp. 2d 28, 32 (D.D.C. 2010) (quoting Dist. of Columbia v. Chinn, 839 A.2d 701, 711 (D.C. 2003)); see also Sabir v. Dist. of Columbia, 755 A.2d 449, 452 (D.C. 2000) ("[I]t is settled that a person cannot negligently commit an intentional tort.").  Plaintiff does not offer any theory of recovery for his negligence counts beyond the two allegedly false arrests in September and December of 2018. Consequently, he cannot maintain those negligence claims in this matter.

Plaintiff's negligence claims nevertheless fail on their merits because, as detailed above, the officers involved had probable cause to support both arrests.  "A general negligence count requires a plaintiff to show, at a bare minimum, a legally cognizable duty and a breach of that duty." Acosta, 386 F.3d at 12 (internal citations omitted).  Since the Tiverton officers in this matter reasonably concluded that there was probable cause both to arrest Plaintiff in September 2018 and to issue a warrant for his arrest in December 2018, Plaintiff falls short in his effort to establish the basic elements of his negligence claims.  Id. (finding that plaintiff "failed to establish the essential elements of her general negligence claim" where "the police acted reasonably in making their probable cause determination and had no duty to investigate further before arresting [her]"); see also Forest v. Pawtucket Police Dep't, 290 F. Supp. 2d 215, 233 (D.R.I. 2003) (granting summary

judgment to municipal defendants on a negligence claim where the police officers involved "conducted an adequate investigation and had probable cause to arrest [plaintiff]"), aff'd on other grounds, 377 F.3d 52 (1st Cir. 2004).  The Tiverton Defendants, therefore, are entitled to summary judgment with respect to Plaintiff's negligence claims.

## IV.    CONCLUSION

For the reasons set forth herein, the Tiverton Defendants respectfully ask that this Court grant their motion for summary judgment.

Defendants,
By their attorneys,

*/s/Marc DeSisto*

*/s/Patrick K. Burns*
Marc DeSisto, Esq. (#2757)
Patrick K. Burns, Esq. (#10107)
DESISTO LAW LLC
60 Ship Street
Providence, RI 02903
(401) 272-4442
marc@desistolaw.com
pburns@desistolaw.com

CERTIFICATION OF SERVICE

I hereby certify that on this 21st day of July, 2020, I electronically filed and served this document through the electronic filing system upon the following:

Brian R. Cunha, Esq. (#4074)          Alexander D. Schultheis, Esq. (#9534)
brian@briancunha.com                  aschultheis@riag.ri.gov

                                      Andrea Shea, Esq. (#9702)
                                      ashea@riag.ri.gov

*/s/Patrick K. Burns*

32